Mr. Marshall, would you please call the first case on the record? Yes, sir. Your Honor, this case is document 2-17-03-19, IAFF Local 413, AFL-CIO, LLC. Plaintiff's Appellant v. The City of Rockford in the Illinois Medical Information Support Defendant's Appendix. Arguing on behalf of the plaintiff's appellant, Ms. Linda R. Clark. Arguing on behalf of the defendant's appellant, Ms. Rockford, Ms. Angela L. Hanna. Arguing on behalf of the defendant's appellant, the Illinois Medical Information Support, Mr. Sean Smith. And just to clarify at the outset, it's my understanding that the appellees have agreed to divide their time, is that correct? That's correct, Your Honor. Okay. And that's acceptable to you? Yes. Okay. With that proviso in mind, counsel for the appellant may proceed. May it please the Court, good morning, Your Honors. My name is Amanda Clark and I'm arguing on behalf of the appellant, IAFF Local 413. Your Honors, at its core, this case is about whether or not the parties reached a meeting of the minds to include in its successor contract medical certification language that the parties had negotiated and agreed to during contract negotiations for that successor agreement. May I ask you a question, a threshold question? Is that an issue that's, is a question of fact for the board? It's a question of, I would say a question of fact in law, but it's based on questions of facts that the board determined in making its decision. So both the manifest way to the evidence standard would apply to the factual determinations that the board made and then the clearly erroneous standard would apply to the decisions that the board made based on those facts. As we review the decision. But the basic question is considered, whether or not there was a meeting of the minds, is considered to be a question of fact. Correct. Not a question of law, obviously. Yes. Okay. So the overwhelming majority of the objective evidence on the record in this case simply does not support the board's finding that the city did not agree to contract language when it signed the TA on July 11th of 2012 and furthermore does not support the board's finding then that the city did not violate the act by not including this language in the party's contract. What was this language according to your argument in the agreement with the city? Where was it supposed to be placed in this agreement? Was that ever determined? An actual, I'm sorry, you're asking an actual section number in the contract? Right. Or was there a certain place that the parties agreed to put it into the contract? Not that was indicated in the agreement itself, but other agreements that the parties reached, other TAs, also did not include an identification of where in the contract that TA would be included, specifically the flex time tentative agreement, which was a city proposal, was new contract language and the TA that was signed by the parties did not contain an identification of either new contract language or the section that should be included. I understand the history of your point, but they seem to be arguing that that's a critical component, that there was no meeting of the minds because nobody ever agreed where the same provision was going. It is true that they didn't agree the exact location, but when compared to the other TAs and the parties agreed to that were included in their agreement subsequently, there's nothing to distinguish the medical certification from, say, the flex time language, which was not identified as new language, or the arbitrator selection language, which also was not identified as new language, or made a clear identification of where in the contract it would be located. The chief agreed to postpone implementation in order to allow the parties to discuss the new policy, correct? Correct. And was that traditional, the way negotiations would take place over enforcement procedures? Excuse me. Are warranted enforcement procedures traditionally left to the chief? So enforcement procedures, as far as policies and procedures, are under the authority of the city, and the union's option is to, which they did here, was grieve during the seven-day notice posting. What changed the issue from being simply a grievance and a discussion of the policy was that the union did issue a demand to bargain over the issue of sick leave, and in response to that demand to bargain, the chief's letter of January 2012 recognized that the city had an obligation to bargain because it was a mandatory subject of bargaining. So while there was delay of implementation, the chief did end up implementing the policy as announced in January 2012, and at the same time recognized that he had an obligation to bargain over a mandatory subject of bargaining. And that was an error in the board's finding, was that they found that the city had never recognized that it was a mandatory subject of bargaining, but the chief's letter clearly states in the second paragraph, and quote, the city recognizes that the union would have the right to propose modifications to the current contract, and the city will honor whatever bargaining obligations it may have in this regard, end quote. And further, the letter states, quote, the city would concede that sick leave is a mandatory subject of bargaining. Again, this letter was written in response to a demand to bargain. So, excuse me, when the parties went into negotiations, they were both under the understanding that they're discussing a mandatory subject of bargaining. Therefore, there did not need to be an invitation made by the city to the union to submit proposals. It was simply a matter of if the union made a proposal, the city was obligated to bargain. If they did make a proposal, the city bargained and the parties agreed. Part of the objective evidence that we believe the board failed to consider in this case, and is incredibly telling as a party's agreement that this was contract language, is that the union filed agreements in 2014, which specifically stated that the city was violating the contract language. And not only was it violating the contract language, but the contract language based on the tentative agreement of July 11, 2012. So that agreement stated, and I quote, language found in the collective bargaining agreement, parens, e.g., the tentative agreement signed on July 11, 2012, close parens, end quote. And then the agreement goes on to mention four more, or at least four times, that it's a violation of the CBA that the union is grieving. Now, the city never objected to this grievance. The city did not say that this grievance was improper because there was no such contract language. In fact, Chief Berkson, who had been present at the small caucus where the TA was agreed to, was involved in the processing of this grievance. They met multiple times on the grievance and settled it. So this is clear objective evidence that the parties agreed that there was contract language. The parties agreed that they should be processing this contract language violation in this grievance and process that to settlement. This is clear objective evidence that the parties were in agreement that their July 11, 2012 TA represented contract language. Not all of the TAs that were appropriating arbitration awards were, in fact, included in the contract, were they? All of the TAs themselves were. There was one exception for language in one of the TAs, and that was for language that dealt with employees that were outside of the bargaining unit. Isn't that somewhat indicative, though, that these TAs were not quite as clear as you would have us believe? I mean, they agreed to something clear that couldn't be in the contract. So perhaps they didn't quite as clearly agree to other things? I believe, Your Honor, that that TA in question— About AFSCME? About AFSCME, yes. So the TA itself also agreed to the city's proposal on the selection of arbitrators. So that was part of that TA. It was a package proposal, and so the fact that that was included was part of the agreement that they had struck to reach agreement on including the city's proposal on arbitrator selection. None of these TAs were reworked. So even TAs that talked about withdrawal of proposals, obviously the contract then didn't include language that said this proposal was withdrawn. But all of the kind of—I want to say the meat and potatoes of what the parties agreed to, the subject matter itself was reflected in the agreement between the parties, except for the AFSCME language, which they're outside of the bargaining unit, so it cannot be properly included in the contract. And then the only other one that wasn't included is the medical certification language. And what do you say to the city's argument that they really would have gotten nothing in return, that they would have pushed for something major had this been an agreement, and that there was no reason or no justification for removing the historical power of the chief to enforce the rules? What do you say to that argument? I would say to that argument that the parties bargained and both parties gave up something. So in the union's case, it doesn't make sense for the union to have given up contract proposals regarding shift bidding to put themselves and their union members in a more restrictive policy than what the city had originally proposed. So the union to have agreed to just a policy change could have subjected itself to a DFR because they allowed the city to have a longer look-back period. And if it were a policy change, it would still have allowed the city to change that policy at will and only been allowed to agree the reasonableness of it. Right, but that policy was changed last time like 30 years ago. Correct, Your Honor, but it doesn't change the fact that the city could change it at any time. Nonetheless, but doesn't that color the context in which these decisions were made? I don't believe so, Your Honor, because again, the demand to bargain issued in 2011 did change the tenor of the conversation and the city's recognition that it was a mandatory subject of bargaining. And furthermore, throughout the hearing before the board, the city argued that the entire purpose of them saying they were not agreeing to contract language because they wanted to retain the ability to change the policy at any time. So it's kind of a having it both ways argument that the city put forward that we have it changed for three years. You don't have to worry about it, but we're not agreeing to contract language because we want to be able to change it at any time. So there was no agreement then? I'm sorry? So is it your position then there was no agreement on that? Agreement, I'm sorry. As to the terms of that policy? That it would remain a policy, not part of the contract? No, I don't believe so, Your Honor, because the first time that the city made the union aware that it was agreeing only to the policy was not at the time that the parties were discussing it. It wasn't until two years after the TA was signed when the parties were trying to draft the agreement itself that the city said they were not including that medical certification language in the contract. Other issues that I would like to address regarding the board's decision is that not only did they ignore the objective evidence of the grievance that was filed and processed by the parties, but they also ignored the fact that the parties have a practice of how they settle grievances and how they settle changes to contract language. And that issue and that practice was evidenced through the demonstrative exhibit of the union and the city's grievance settlement and contract language change from 2015. So you're saying the traditional practice would bear on whether or not there was a meeting of the minds in this instance? Your Honor, I think it bears on the fact that the city was aware of this practice, and if at the time they signed this agreement they knew they were signing only a policy change, then the document that they signed should have reflected the grievance change document from 2015, and it doesn't. That July 11, 2012 agreement is almost identical to the contract change language form from the 2015 settlement. So it shows that the parties were aware of how they did this, and the city did not demand that since it was only a grievance settlement it should be on the grievance settlement form. The parties agreed to the form that the parties used for changing contract language itself, and neither the board, the city, or the state addressed that issue. So it's clear that the parties were there at some point to negotiate perhaps a successor contract, but the board's finding perhaps addresses a more subtle point, that even if they were there to negotiate a contract with respect to the medical certification language, each side had a different understanding of where that language would be placed, and there was never a meeting of the minds on where that would be placed. Now, where did the board go wrong with that conclusion? Well, I think as previously discussed, Your Honor, the board failed to recognize that the city had recognized in response to the union's demand to bargain that this was a mandatory subject of bargaining. So going into negotiations, part of the board's ruling was that the city never recognized this as a mandatory subject of bargaining and never solicited proposals from the union, but that simply isn't true.  But furthermore, part of the board's finding is also that union's counsel in that meeting regarding the TA on medical certification language, the board said there was no overt statement made that this is contract language. Well, the problem with that finding, Your Honor, is that none of the TAs were prefaced with, this is a proposal for contract language, that all of the parties are in agreement that no one had to say that before contract proposals were exchanged in order for the parties to know it was a contract proposal. So you're saying a logic and common sense would dictate that that was the purpose without somebody spelling it out and blanking on it. Correct, Your Honor. And as evidenced by the fact that the remainder of the TA language, including the non-413 personnel language that's contained in the same TA as the medical certification language, was abided by by the parties. There wasn't a distinction that even though union counsel did not say this is a contract proposal and therefore the medical certification language is out, so therefore shouldn't the non-413 personnel section also be out? That didn't happen. The parties abided by that language, even though it was contained in the same TA. As further evidence of the fact, it didn't have to be spelled out or something. Correct, Your Honor. So in addition to that is the fact that, again, these discussions were taking place in contract negotiations with both parties in agreement that sick leave is a mandatory subject of bargaining. They submitted these issues to the arbitrator and were stipulated to be part of his award. And the board's own rules and regulations state in Administrative Rule 1230.110 that if a governing body does not reject the terms of an interest arbitrator's award, the award, quote, shall become part of the party's collective bargaining agreement, end quote. And in this case, the parties did just that. They stipulated that these TAs, including the medical certification language, would become part of the arbitrator's award. And the award, in fact, states, quote, additional, as per the party's stipulation, as set forth above at paragraph 5, I incorporate all tentative agreements made by the parties in their pre-arbitration negotiations into this opinion and award, end quote. So by the board's own rules, by incorporating and stipulating that this TA is in the arbitrator's award and there's no evidence that the governing body of the city of Rockford rejected any or all of those of the arbitrator's award, this TA should be part of the collective bargaining agreement. Let me ask you a final question on your portion of this argument. In order for us to overturn or reverse the finding of the board, what is your suggested standard of review that we have to find? What do we need to find to be able to overturn the board's decision? Because as you know, in a review, there's a depreventive standard that has to be. So what is your understanding of that review? My understanding of that review, Your Honor, is that first the board's finding of facts have to be reviewed for manifest weight of the evidence. And I believe that the manifest weight of the evidence shows that the board's findings are not. But the manifest weight of the evidence standard is defined as to overturn it, we would have to find that an opposite conclusion is clearly apparent, right? Correct, Your Honor. Okay. All right, thank you very much. Thank you, Your Honor. Ms. Hammer? May it please the Court, Counsel. Good morning, Your Honors. My name is Angela Hammer. I'm an attorney for the City of Rockford, a Pelley in this case. The central question before the Court is whether the Labor Relations Board was clearly erroneous, finding that the city and the union did not have a meeting of the minds in this matter. The objective evidence in the record supports the board's findings, and additionally there is no evidence in the record to support the union's position that there was no meeting of the minds and that the board's decision should be overturned. The express language of the tentative agreement demonstrates that it was the city's intent to change the sick policy and not the collective bargain agreement language. Can you specify why that's the case? Where is the clear intent in the record? The union refers to the sick leave policy as having unilateral changes in Exhibits 193 through 197, the proposals that were exchanged and the communications that were exchanged between Brad Walker, who was then the president of the union, and Chief Garrett Bergsten, who was chief of the fire department. Additionally, at the end of the sentence in that exhibit, the union noted that, quote, the following language, end quote, had to be, quote, agreed upon. And where the clauses are read together, the full sentence indicates that the union would withdraw its challenges to the, quote, unilateral, end quote, changes to the sick leave policy through the adoption of, quote, agreed upon language. So is the city's position that there was never an intent to get together and wrap the contract? No, Your Honor. It's the city's position that the city intended to draft policy changes pursuant to Article 13.1 of the CBA, which required the notice to the union, but did not require mandatory bargaining for such a change. Are you saying that that was clear to the union all along? Is that your position? I'm not saying that was clear to the union. I'm saying that was the city's intent based upon the objective evidence in the record, and that's supported by the testimony of Chief Bergsten as well as the testimony of legal director Patrick Hayes, who was the chief spokesperson for the city during those contract negotiations. How do you respond to the union's argument, why would the union place its members in a worse position under a policy than the city itself had proposed if it was going to allow the city to alter the policy at will in the future? It's sort of a compelling, intuitive appeal. Why would they do that? Your Honor, I don't know what the intent of the union was in negotiating this language and reaching this resolution, but it's clear from the record that the city's intent was never to include it in contract language. So perhaps that was the union's intent to include it in the contract, but it was not the city's intent to include it. You're saying that's supported by the objective evidence. I'm saying this. The city's intent is supported by the surrounding objective evidence. Correct, Your Honor. Yes. From the city's perspective, the best evidence of the intent of the city is that testimony of Patrick Hayes, who was the legal director and chief spokesperson for the city during the contract negotiations that are at issue, and he testified that it was never the city's intent to include this change in the contract. To be sort of blunt, wasn't that a little controversial? Didn't there allegedly flip-flop on the testimony, depending on how you interpret it? Yes, Your Honor. I think once the question was clarified, Mr. Hayes answered it. I think he misunderstood the question, and once it was clarified in the record, he did testify that it was not the city's intent to include that language in the CBA. So the city's intent was to solicit language for the policy change. Correct. Not for the CBA. Correct, and that's consistent with past practice. Then your position is that the city, as Hayes testified, the city would have demanded some other major concessions if that were the case. Correct. This was a significant management right to allow the city and the chief specifically to change performance policy and conduct policy. Day-to-day enforcement for the chief, it would have been disruptive to the operations. I apologize, Your Honor. Had that been in the CBA's, at the city's position, it would have been disruptive to the operations of the fire department. Yes, Your Honor. Essentially, the city maintains the same position, as always maintained during the course of this case, that it was our intention to change the policy, as we're allowed to do under Article 13.1 of the CBA, and it's typical to engage the union in discussions to reach some mutually acceptable language for policy, and that's what was done pursuant to the request from President John Walker who sent the letter to Chief Berkston asking that this be discussed during the next negotiation session. And pursuant to that request, the city put a proposal together to be discussed during that round of negotiations, but there was no evidence to support the union's contention that the city intended to draft contract changes. And furthermore, the testimony of counsel for the union indicated that she did not make any overt statements that this was to be included in the policy. She did make a statement that she wanted it, quote-unquote, locked down, though. Correct, locked down, but when asked if she... Well, what's the difference? I think having a resolution was locking it down, having some consistency, but locking it down doesn't mean that it's in the contract, and clearly that wasn't the city's understanding. And consistent with that, counsel testified that there were no overt statements indicating that it was to be included in the contract. The union also relies on the headers of the tentative agreement indicating 2012-2014 contract as evidence that it should be included, but there's evidence in the record that indicates another TA with the same heading was not included regarding the AFSCME telecommunicators position. Additionally, to the court's point, this was a significant management right, and consistent with Patrick Hayes' testimony, it's not something that the city would have negotiated away pursuant to the tentative agreement to become contract language. The January 2012 letter that the union relies upon from Chief Bergsten, while he does concede that mandatory... I'm sorry, that sick leave is a mandatory subject of bargaining, that's a general statement. Given Article 13.1 in our collective bargaining agreement, this portion of the policy was not a mandatory subject of bargaining. The chief had that discretion pursuant to 13.1, and pursuant to the notice requirements. So the letter the union relies upon made a general statement that typically... Recognizes the right to... Correct, Your Honor, but did not speak to this incident, and in fact, later on in that same letter, noted that this is done pursuant to Article 13.1 of the CBA. And in compliance with that provision, the chief sent out a notice to the union at least five days in advance of the implementation. There's no evidence in the record indicating where in the contract the language would be included. If the union believed that it was to be included in the collective bargaining agreement, section numbers were not referenced. There was no discussion regarding that. That may be true, but one of the themes they seem to be arguing is aren't you exalting the informal substance? The fact that it's not agreed on a specific place. That's possible, Your Honor. However, the best evidence of that would be the testimony of the chief negotiator for the city, and the spokesperson for the city, who testified that it was never his understanding or his intent that this would be contract language. Okay. If there are no further questions... Wouldn't that ultimately then come down to a credibility question? I mean, a party says this, another party says something different. It's a credibility call. That may be true. However, Your Honor, in this case, the ALJ that heard the testimony was not the same ALJ that made the recommendation to the labor board. So if that is a consideration, it shouldn't be given much weight in this case because the ALJ that made the recommendation to the labor board was not... Correct. Yes. Thank you very much. Mr. Schmidt, on behalf of the Labor Relations Board. Thank you, Your Honor, and may it please the court and counsel, John Schmidt, as Your Honor indicated, on behalf of the ILRB, and Justice Hudson, I want to just start by addressing your question. You asked my co-counsel, and that was, why would the union have given, conceded somewhat on the medical certification language? I mean, it has a substantial impact on them, does it not? Oh, sure. It does, Your Honor, but according to Mr. Hayes, who was the city's chief negotiator, and this is at page 314 of the hearing transcript, he said that the union conceded on that issue as sort of a quid pro quo for the city's concession on another issue, and he testified that issue involved excluding non-union personnel from facilities that union employees use, and this is something that's common in the bargaining process. One side may give on one issue in exchange for the other side giving on another, and that's what Mr. Hayes testified to in this situation. And did you believe that Hayes' testimony was clear once it was corrected? The board thought so, and one reason for that is that it didn't just consider that little excerpt. It considered his testimony as a whole, and it really considered his answer of no to be consistent with his other testimony to the effect that no, the city was, in other areas of the record, that the city was not interested in putting that language in the collective bargaining agreement and that that was not the city's intent. So that's what the board believed, that the no was really more consistent with his testimony and also the chief's, and the rest of that testimony was consistent that the city did not intend to do that. And Mr. Hayes said it would have only done so in exchange for a large concession on the union's part, and in that context, I want to shift over to the chief's letter in which he said that this was a subject of bargaining. It may have been a mandatory subject of bargaining, and Section 7 of the Act addresses what is a mandatory subject of bargaining, and that would be matters that relate to conditions of employment. But the fact that something is a mandatory subject of bargaining does not dictate a particular result. In other words, the chief may have been saying, yes, we're obligated to negotiate about that. That doesn't mean the chief was saying we're willing to change the status quo on our rules and to put this rule in the collective bargaining. You're reading the letter saying the chief recognizes the union's right to bargain. It's an obligation to bargain, but it doesn't mandate a certain result come out of that. Exactly, Your Honor. The board also looked at that letter as a whole and indicated that it believed that the city was, while recognizing its right, its obligation to bargain if the union requested it, the city was reiterating its position that, under the current situation, the chief could change a rule as long as it followed the applicable procedure, and the applicable procedure was 7 days' notice to the union. And one other important thing, though, is that if a rule was changed, the union did still possess the right to grieve that rule change and say it was an unreasonable change, which is exactly what was done here. And that's sort of what created, in a way, that's what created the problem. The question was, were these negotiations over the change in the policy language, were they merely settling agreements, or was there an intent to put it in the collective bargaining agreement? Well, the counsel's point, then, that the would-be agreement was on a form regarding the contract as opposed to a form regarding a grievance resolution. I think that would weigh somewhat in their favor, but I think taking the evidence, there is other evidence that would point in a different direction. And one thing, in terms of the context in which this arose, the chief had, I believe, since 1988, had the right to change rules, and those rules were not part of the collective bargaining agreement. So that historical context, I think, favors the city's position here. If the union was to wish to place that language in the CBA, it would behoove the union to make that clear in this situation. And so the board asks, the board basically concluded here that there simply wasn't a meeting of the minds. And basically the steps in that reasoning are, there was an ambiguity as to whether this language would be in the collective bargaining agreement or merely be reflected in a change of the rules. And each party had different beliefs as to what the situation was. Therefore, there was not a meeting of the minds between them. And the board's position is that finding is not against the manifest weight of the evidence. There is evidence on the record supporting it, and we ask that the board's decision be approved. All right. Thank you, Mr. Schmidt. Ms. Clark, can you address the court in the middle? Your Honors, I think very telling in both of the appellee's co-counsel's arguments today was that they still did not address the May 2014 grievance between the parties where the city processed a grievance-alleged contract language violation specifically referring to the TA of July 11, 2012. That issue has gone completely unaddressed by the board, the city, and the state in their arguments. And that is clear, objective behavior that shows that the parties agreed there was contract language. The definition of a grievance under the contract is, quote, a grievance shall mean any dispute or complaint concerning the interpretation of, application of, or compliance with the terms of this agreement. So for the city and the state to continue to fail to address this issue I think is very telling. This is very clear, objective evidence of the parties' agreement that there was contract language agreed to and the union's allegation that that contract language was violated. Furthermore, both appellee co-counsels seem to rely heavily on Mr. Hayes' testimony about what the intent of the city was. The problem is, is Mr. Hayes' testimony regarding intent is completely subjective. When the objective evidence is looked at, when the fact that the union demanded bargaining over the issue of sick leave, the chief recognized that, yes, while the city had authority under the current collective bargaining agreement to change the policy, it also recognized that in a future collective bargaining agreement and negotiations over that agreement, the union could demand changes and the city would uphold its obligations to bargain. They did bargain. They reached an agreement. They submitted it to the interest arbitrator. The interest arbitrator's award was confirmed by the governing board of the city of Rockford, and agreements was processed under that language. That's the objective evidence which shows an agreement. Mr. Hayes' subjective belief does not weigh into the determination of whether there was a meeting of the minds. Furthermore, Mr. Hayes' testimony, excuse me, he corrected himself on, okay, I'm sorry, he didn't correct himself. His own counsel interrupted him. He was asked if he had solicited contract language proposals. The word contract in the hearing had only been used to refer to a collective bargaining agreement. There was no other contract at issue in this case. And so for counsel to interrupt him and redirect him to say, oh, no, no, I'm at the collective bargaining agreement, and then Mr. Hayes' answer is pretty nonsensical. His response was, quote, no, because we were not interested in, again, in restricting the ability to modify behavior to the collective bargaining process as far as it related to the contract. I'm not sure that that's a solid disavowal of the fact that they were aware that they were negotiating contract language. It's not a clear statement of anything, let alone a reliance that it was communicated to the union in any objective manner that the city was not bargaining contract language. Furthermore, the city also, I'm sorry, appellate co-counsels also stated that it was simply the parties negotiating a change to the policy. But if that's the case, why, if the union had requested that the policy not be implemented and be held in abeyance pending discussions, did the city then implement regardless of the fact that there was no agreement? The city implemented the policy change in January 2012 after the union had asked for the implementation to be held in abeyance. If, as the city's counsel suggested, that the city was just trying to reach agreement with the union in these negotiations, the city's own behavior is objective evidence that that was not their belief at the time. They implemented without agreement with the union. Furthermore, Mr. Hayes' testimony regarding the city would have asked for more or something larger in exchange for putting this language into the contract, again, that's subjective testimony. That was never communicated to the union at the time that they were negotiating this language. It wasn't communicated at the time that the TA was submitted to the interest arbitrator, and it wasn't communicated at the time the city and the union processed the grievance regarding violation of this contract language. And furthermore, the union also withdrew contract language proposals to get an agreement on this. So the union was also – Wait a minute. You said they withdrew things to get an agreement on this. Now, is there anything objective that would say that what was withdrawn was specifically in response to this clause or as a general concession here to get that? Your Honor, if you look at the proposals offered by the union on the medical certification language – may I finish my answer? Yes, of course. Those proposals progressed, and they progressed both in the fact that the union made the medical certification language more restrictive and then also in that package proposal stripped out a contract language proposal regarding shift bidding that the union had wanted to go in. And once that was taken out and a small language change that was requested by the chief was made to the medical certification language, the party signed off on that medical certification language. Okay. Thank you, Your Honor. All right. That will conclude the arguments in this case. I would like to thank all counsel for the quality of the arguments here this morning. The matter will, of course, be taken under advisement by the court. A written decision reflecting our decision will be issued in due course. We stand adjourned to prepare for the next case. Thank you.